IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. DERRICK RICE

### Direct Appeal from the Criminal Court of Shelby County

### No. 08-07884    J. Robert Carter, Judge

### No. W2010-02421-CCA-R3-CD  - Filed November 9, 2011

Derrick Rice ("the Defendant") appeals jury convictions for first degree premeditated murder and attempted first degree premeditated murder, claiming that the trial court erred in denying extrinsic evidence of a prior inconsistent statement to impeach the testimony of a witness and challenging the sufficiency of the evidence for both convictions. After a thorough review of the record and the applicable law, we affirm the Defendant's convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Barry W. Kuhn (on appeal) and Jane Sturdivant (at trial), Memphis, Tennessee, for the appellant, Derrick Rice.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

This case arises out of a shooting in Shelby County on June 1, 2008, that killed Antonio Polk and injured Michelle Wright. The Defendant was subsequently indicted for first degree premeditated murder, attempted first degree premeditated murder, and employing a firearm in the commission of a felony. Before trial, the trial court dismissed the third count

of the indictment. On October 7, 2010, a jury convicted the Defendant of first degree premeditated murder and attempted first degree premeditated murder. The trial court sentenced the Defendant to life imprisonment for the first degree murder conviction and a fifteen year concurrent sentence for the attempted first degree murder conviction. The Defendant filed a motion for a new trial, which was denied by the trial court. The Defendant then filed a timely notice of appeal.

At trial, Ms. Wright[1] testified that, on the day of the shooting, she was sitting on the back steps of her house with her son, Polk. She stated that when she first saw the Defendant, he was walking through her house from the kitchen and about to exit through the back door. Ms. Wright indicated that she had a three-month relationship with the Defendant at that time, but she was not expecting him at her house at that time. She testified[2] that, as the Defendant walked out the back door, he asked her what she was doing. She thought that the Defendant then shared some words with Polk, at which point Polk looked at the Defendant and then jumped up from the step. Ms. Wright saw the Defendant reach into his pocket and pull out a gun with which he immediately shot Polk. Ms. Wright testified that she asked the Defendant why he shot Polk, and as she jumped up and ran, the Defendant shot her in the back. She stated that she then ran around the side of the house to the front in order to get to her brother's house next door. She testified that she lay on the floor at her brother's house until the ambulance arrived and transported her to the hospital.

Gary Wright, Ms. Wright's brother and next door neighbor, testified that he was in his house when he heard two gunshots. According to Wright, he went to open the front door and saw his nephew, Polk, standing outside with his hand around his neck trying to say something. Wright said that Polk fell into the living room, and Wright asked his son to call the paramedic. Wright testified that he then heard Ms. Wright screaming outside. He stated,

> So, I go back to the door to see where she's at, she's hollering. So, when I open my wrought iron door she come around the side of her house running across her grass to my door. At that time, I see her and *I see [the Defendant]*. He's behind her, he's like in the driveway, because she's running toward my door. *He aimed the firearm he had in his hand and fired one shot at her, hit her*[.]

---

[1]There are two witnesses in this case with the last name "Wright." Therefore, in order to avoid confusion, we will refer to Michelle Wright as "Ms. Wright" and Gary Wright as "Wright."

[2] Ms. Wright is hearing impaired. She required an interpreter at trial to use sign language in order to help facilitate her testimony.

(Emphases added). Wright continued: "once he hit her, shot her with the gun, and I see[n] her wimp [sic] down, when she approached the steps, so I reached my hand out to reach and grab her to pull her from the step into the house." After Wright got his sister into his house, he returned to his door and saw the Defendant on the sidewalk in front of Wright's house. Wright demanded to know what the Defendant was doing, but the Defendant did not respond. Instead, according to Wright, the Defendant "looked and pointed the gun and fired a shot." Wright closed his door, reopened it, and again spoke to the Defendant who was now across the street. The police arrived shortly thereafter and detained the Defendant. Wright stated that he heard four shots in all: the first two, then the one that hit his sister, and the fourth shot at him.

On cross-examination, Wright verified that his testimony was that he actually saw his sister get shot. She was hit while on Wright's front steps, and the shot hit her in her back. Wright also acknowledged having given a statement to the police on the night of the shooting. Defense counsel asked if Wright "recall[ed] telling [the police] that [he] did not see her get shot." Wright responded, "Excuse me. No. No. Watching my sister, coming from the side of the house, looking at [the Defendant]. [The Defendant] looking at me, as he's approaching my sister. I watched [the Defendant] fire one shot, and hit my sister."

On redirect examination, the State showed Wright a single page document titled "Photographic Line-up Statement." On this document, Wright identified the statement "I saw him shoot my sister" as being his own handwriting. This document was admitted into evidence without objection. Wright also testified on redirect that he saw the gun in the Defendant's hand, and he believed the gun to be a .38 or .32 caliber black handgun.

On recross-examination, defense counsel asked, "[s]o, what you said in 2008 about four hours after the incident when you said you did not see him and did not see him for another thirty seconds, that was incorrect?" Wright responded, "I saw Derrick shoot her and at the same time Derrick was still in my eyesight after he shot my sister. [He w]alked across the street and knocked on his door, his brother's door, and the police was [sic] coming up the street."

Officer Christopher Ross of the Memphis Police Department ("MPD") testified that he arrived on the scene with his partner after hearing about six or seven gunshots from a block away. As they neared the scene, they saw a man running along the side of the road with a small black revolver. Officer Ross identified that man at trial as the Defendant. Officer Ross stated that he and his partner held the Defendant at gunpoint, instructed him to drop his weapon, and detained him in the back of their squad car. Officer Ross testified that while he was in the car writing his report, the Defendant began to talk spontaneously. The Defendant said, "I told them not to f**k with me . . . . I was trained by the military. I was

a trained killer, and that's my job, and they had no business f**king with me like that." Officer Ross noted that the Defendant had an odor of alcohol on his breath but was talking coherently.

Michael McCaslin, a firefighter and Emergency Medical Technician for the Memphis Fire Department, testified that he arrived on the scene after receiving a call about a shooting with multiple victims. McCaslin stated that when he arrived, there were already paramedics working on Ms. Wright, so he placed electrodes on Polk's back to attempt to find his heart rate. Polk, however, was already dead. Shifting his focus to Ms. Wright, who was in critical condition, McCaslin transported her to Regional Medical Center.

Officer Joseph Stark of the MPD testified that he interviewed the Defendant the day after the shooting. Before Officer Stark was able to go through the advice of rights, the Defendant told Officer Stark that he was sorry he shot Polk and Ms. Wright. Once Officer Stark finished the advice of rights, the Defendant said he wanted an attorney before proceeding. However, Officer Stark testified that the Defendant changed his mind before being taken back to jail and waived his right to an attorney.

Officer Stark stated that the Defendant then told him that, on the day of the shooting, the Defendant had been on the phone with Polk. The Defendant told Officer Stark that Polk was "talking stupid" and hung up in the Defendant's face. According to the Defendant, he then took a gun with him to Ms. Wright's house because Polk had threatened him on a previous occasion. The Defendant told Officer Stark that, once he got over to the house, "[Polk] stood up like he was fixing to do something and that's when I started shooting." The Defendant stated, "[t]hen they jumped up and ran and I kept on shooting." When Officer Stark asked about the previous situation in which Polk threatened the Defendant, the Defendant said, "[Polk] told me that if I touched [Ms. Wright] he was going to bust my head. I told him, boy, you better get in your place." Officer Stark testified that the Defendant claimed he had consumed half a pint of whiskey and a quart of beer on the day of the shooting.

On cross-examination, Officer Stark testified that he waited twenty-four hours to take the Defendant's statement because the Defendant was intoxicated on the day of the shooting. Officer Stark also acknowledged that he took a statement from Wright on the day of the shooting. Defense counsel asked Officer Stark if he would like to review Wright's statement before answering questions about it, and Officer Stark responded that he would. At that point, the State objected to further cross-examination about Wright's statement. The trial court sustained the State's objection on the basis that Wright "was pretty vague . . . as opposed to denying . . . the statement" that he had not actually seen the Defendant shoot Ms. Wright. The trial judge stated, "my notes reflect that when [Wright] was asked about

-4-

whether he saw the shooting or just the flinch, that he then said, yes, it was actually the flinch, but I know [the Defendant] shot [Ms. Wright]." Defense counsel did not proffer a copy of Wright's statement for identification purposes[3] and did not further pursue the topic of Wright's statement.

Lieutenant Walter Davidson testified that the weapon retrieved from the Defendant was a .38 Smith and Wesson revolver. On cross-examination, the defense asked Lieutenant Davidson why he decided not to interview the Defendant on the day of the shooting. Lieutenant Davidson responded that "[the Defendant] was drunk." He added,

[a]nd it's part of our– when we advise someone of their rights, we have to be able to come in front of you all and testify that we knew that [the Defendant] understood his rights and if he was intoxicated, I don't believe I could testify to you all that he would understand his rights.

On redirect, the State asked whether the Defendant was coherent on the day of the shooting. Lieutenant Davidson said yes, but, in light of the fact that the Defendant had been drinking, Lieutenant Davidson did not want to take a chance. The State said, "[s]o, it was out of an abundance of caution?" and Lieutenant Davidson agreed.

Sergeant Marlon Wright of the MPD testified that he went to the scene of the shooting as part of the crime scene investigation. At trial, he identified three spent casings which were found at and around the steps of the house across the street from Ms. Wright. Sergeant Wright explained that, in a revolver, the spent casings must be physically removed from the cylinder of the gun.

Dr. Marco Ross of the Shelby County Medical Examiner's Office testified regarding Polk's autopsy report, stating that the cause of death was a gunshot wound to the side of the torso, penetrating the lung, esophagus, and aorta before exiting out the other side and into his arm. Dr. Ross indicated that the wound was consistent with someone running. He also identified the bullet found in Polk's arm during the autopsy.

Cervinia Braswell of the Tennessee Bureau of Investigation testified regarding her forensic analysis of the revolver retrieved from the Defendant. Agent Braswell indicated that the shell casings found across the street from Ms. Wright's house as well as the bullet retrieved from Polk's arm were fired from the revolver recovered from the Defendant.

---

[3]While proffering the statement for identification purposes was not required, it would have been helpful in order for this Court to determine whether Wright's prior inconsistent statement was, indeed, inconsistent. See Tenn. R. Evid. 613(b).

At the end of the State's proof, the Defendant chose not to testify and the defense put on no proof. After deliberation, the jury returned guilty verdicts for both first degree premeditated murder and attempted first degree premeditated murder . The Defendant now appeals, arguing that the court erred in denying evidence of Wright's prior inconsistent statement and also challenging the sufficiency of the evidence for both convictions. Specifically, in his challenge regarding the sufficiency of the evidence, the Defendant asserts that his voluntary intoxication negated the premeditation and intent elements required for both convictions.

## ANALYSIS

### I. Extrinsic Proof of Prior Inconsistent Statement

The Defendant argues that the trial court erred in not allowing him to adduce proof through Officer Stark that Wright had made a prior inconsistent statement regarding whether or not Wright saw the Defendant shoot Ms. Wright. The State responds that extrinsic evidence was not necessary and, in the alternative, that any error based on the exclusion of that evidence was harmless.[4]

### A. Standard of Review

We review issues regarding the admissibility of evidence under an abuse of discretion standard. State v. Looper, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (quoting State v. James, 81 S.W.3d 751, 760 (Tenn. 2002)). Thus, the trial court's decision will remain intact unless the reviewing court determines that the trial court abused its discretion. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). The only situations in which reviewing courts in Tennessee will find an abuse of discretion are "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Banks, 271 S.W.3d at 116 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)). See also Looper, 118 S.W.3d at 422.

---

[4] We note that the record does not indicate any request from the Defendant to admit Wright's prior inconsistent statement as substantive evidence under Tennessee Rule of Evidence 803(26). Therefore, we will limit our review to the issue of whether the statement was admissible for the limited purpose of impeachment under Tennessee Rule of Evidence 613(b).

B. Analysis

Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." As a threshold requirement, the prior statement must "'either by what it says or what it omits to say' afford[] some indication that the fact was different from the testimony of the witness whom it sought to contradict." Neil P. Cohen et al., Tennessee Law of Evidence §6.13[3] at 6-139 (5th ed. 2005) (quoting United States v. Gravely, 840 F.2d 1156, 1163 (4th Cir. 1988)). Our Supreme Court has explained that extrinsic evidence of a prior inconsistent statement is admissible only when: (1) the party wanting to admit the statement questions the witness as to whether or not the witness made a prior statement inconsistent with his or her testimony at trial; and (2) "the witness denies or equivocates as to having made the prior inconsistent statement." State v. Martin, 964 S.W.2d 564, 565 (Tenn. 1998).

In this case, Wright testified at trial that he saw the Defendant aim his handgun at Ms. Wright and then shoot her. During cross-examination, the defense inquired whether he had told the police on the night of the shooting that he did *not* actually see the Defendant when the Defendant shot his sister. Wright responded, "No. No." and then reiterated that he *had* seen the Defendant shoot his sister. Defense counsel later asked, "[s]o, what you said in 2008 about four hours after the incident when you said you did not see him and did not see him for another thirty seconds, that was incorrect?" Wright responded, "I saw Derrick shoot her and at the same time Derrick was still in my eyesight after he shot my sister. [He w]alked across the street and knocked on his door, his brother's door, and the police was [sic] coming up the street."

This exchange was sufficient to lay the foundation for the introduction of extrinsic proof of a prior inconsistent statement. See id. (explaining that the foundational requirement for the admission of extrinsic evidence of a prior inconsistent statement is the witness's denial or equivocation about having made the prior inconsistent statement); State v. Kendricks, 947 S.W.2d 875, 881-82 (Tenn. Crim. App. 1996) (holding that extrinsic evidence of a prior inconsistent statement is admissible where the witness denies or does not recall having made the statement).

However, when defense counsel tried to elicit Officer Stark's testimony about Wright's prior statement to police, the trial court's recollection of Wright's testimony was incomplete. The trial court recalled only that, when confronted with his prior inconsistent statement that he had *not* seen the Defendant shoot his sister, Wright was "pretty vague on it as opposed to denying that he made the statement." The trial judge stated, "my notes

reflect that when [Wright] was asked about whether he saw the shooting or just the flinch, that he then said, yes, it was actually the flinch, but I know [the Defendant] shot [Ms. Wright]."

The factual basis on which the trial judge relied in denying the extrinsic evidence of the prior inconsistent statement was not consistent with the testimony at trial. After a thorough review of the record, the transcript does not reflect that Wright in fact denied seeing the Defendant shoot Ms. Wright. Quite the contrary, Wright repeatedly insisted that he *did* see the Defendant shoot Ms. Wright. Therefore, we hold that the trial court erred in denying the defense the opportunity to adduce extrinsic proof of Wright's prior inconsistent statement through Officer Stark.[5] See Banks, 271 S.W.3d at 116 (holding that one instance in which abuse of discretion may be found is where the trial court "based its decision on a clearly erroneous assessment of the evidence"). We also hold, however, that this error was harmless.

Because errors regarding the admissibility of evidence typically do not violate constitutional rights, the harmlessness of such errors is assessed under the guidelines provided in Tennessee Rule of Appellate Procedure 36(b). State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). Under Tennessee law, the defendant bears the burden of demonstrating that such an error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 372. In evaluating the impact of the error, appellate courts must assess the record of the trial court in its entirety, taking into consideration all properly admitted evidence pointing toward the defendant's guilt. Rodriguez, 254 S.W.3d at 372. Thus, "[t]he greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Id. (citing State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003); State v. Francis, 669 S.W.2d 85, 91 (Tenn. 1984)).

Proof of a witness's prior inconsistent statement is admissible for impeachment purposes, State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000), and is therefore limited in its impact to damaging the credibility of the witness.[6] Even if the jury were to completely

---

[5] We also note that the more appropriate procedure for the admission of Wright's prior statement was during Wright's testimony. Although Tennessee Rule of Evidence 613(a) does not require that the witness be shown a copy of the statement, the better practice is to introduce the statement for impeachment purposes under Tennessee Rule of Evidence 613(b) while the witness who made the statement is on the stand. This procedure may avoid later conflicts about what the witness actually said if the impeaching party attempts to introduce the statement through a subsequent witness.

[6] State v. Smith also held that "[a] trial court, however, generally has no duty to exclude evidence
(continued...)

discredit Wright's testimony about having seen the Defendant shoot Ms. Wright, the jury had before it Ms. Wright's testimony that the Defendant shot her and the Defendant's own confession that he shot Ms. Wright. Therefore, we find that harmless error applies, and the Defendant is not entitled to relief on this basis.

## II. Sufficiency of the Evidence

### A. Standard of Review

The Defendant also contends that the State's evidence was insufficient to support his convictions for first degree premeditated murder and attempted first degree premeditated murder. He also asserts that his voluntary intoxication negated the required premeditation and intent elements of both convictions. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

---

[6](...continued)
or to provide a limiting instruction to the jury in the absence of a timely objection . . . . Merely being subject to objection . . . does not mean that such evidence cannot be considered for its substantive value when no objection is raised." 24 S.W.3d at 279-280. However, substantive use of Wright's prior statement is not an issue before this Court.

## B. First Degree Premeditated Murder

First degree premeditated murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2007). The existence of premeditation is a factual determination to be made by the jury in light of all the surrounding circumstances. State v. Schmeiderer, 319 S.W.3d 607, 635 (Tenn. 2010); see also State v. Vaughn, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008). Premeditation is defined by statute as:

> . . . an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 2007).

Because premeditation requires insight into the defendant's state of mind, a jury may infer the defendant's intent based on his or her actions and the surrounding facts and circumstances of the killing. State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005); see also State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006); Vaughn, 279 S.W.3d at 594-95. Thus, "[a]lthough a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." Jackson, 173 S.W.3d at 408 (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)).

Our Supreme Court has identified a number of relevant circumstances that may indicate premeditation, including: "the use of a deadly weapon upon an unarmed victim; . . . declarations by the defendant of an intent to kill; evidence of procurement of a weapon," Bland, 958 S.W.2d at 660; and "failure to provide aid or assistance to the victim." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008) (citations omitted). Additionally, the jury may also take into consideration "the shooting of a victim after [the victim] had turned to retreat or escape." State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

The Defendant contends that the evidence is not sufficient to support the premeditation element of his murder conviction. We disagree. The Defendant admitted to Officer Stark that he armed himself before going over to Ms. Wright's home. Ms. Wright testified that Polk jumped up from the steps and began running away from the Defendant, which indicates an attempt to retreat or escape. Then, the Defendant immediately shot Polk.

-10-

There was no evidence or testimony to indicate that Polk was armed. Ms. Wright stated that, immediately after the Defendant shot Polk, she began to run away, and the Defendant shot her in the back. Wright testified that, after shooting Ms. Wright, the Defendant shot at Wright's door and then walked across the street. Therefore, the Defendant did not attempt to aid Polk in any way after shooting him. Officer Ross testified that, once secured in the squad car, the Defendant said, "I told them not to f**k with me . . . . I was trained by the military. I was a trained killer, and that's my job, and they had no business f**king with me like that." Thus, we have facts indicating that the Defendant armed himself, shot Polk while Polk was running away, failed to attempt to aid Polk after shooting him, and made statements evidencing his prior declarations of threats toward Polk and Ms. Wright. Viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the jury had ample evidence to find the existence of premeditation beyond a reasonable doubt sufficient to support a first degree premeditated murder conviction.

## C. Attempted First Degree Premeditated Murder

The Defendant also challenges the sufficiency of the State's evidence to support his conviction for attempted first degree premeditated murder of Ms. Wright. Criminal attempt requires that the accused act "with the kind of culpability otherwise required for the offense . . . [and] intentionally engage[] in action or cause[] a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be." Tenn. Code Ann. § 39-12-101(a)(1) (2006). Therefore, because first degree premeditated murder requires premeditation and intent to kill, attempted first degree murder requires the same culpability. See id.; Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2007). Thus, this Court can look to the surrounding factual circumstances in order to find a showing of premeditation and intent, even where the accused fails to kill the victim. See Tenn. Code Ann. § 39-12-101(a)(1); Bland, 958 S.W.2d at 660; Lewis, 36 S.W.3d at 96.

As to the premeditation element required for the conviction of attempted first degree murder, we likewise find sufficient evidence presented to the jury to support a guilty verdict. As previously discussed, the Defendant admitted to Officer Stark that he armed himself before going over to Ms. Wright's home. There was no testimony or other evidence that Ms. Wright was armed. Ms. Wright testified that she was running from the Defendant when he opened fire on her. He shot her in the back, indicative of her attempted escape. Wright testified that, after the Defendant shot Ms. Wright, the Defendant fired a shot toward Wright and then walked across the street. Thus, the Defendant failed to aid Ms. Wright once he shot her. Based on these facts and their direct correlation to the previously stated factors, we hold that the evidence was sufficient to support a jury's finding of premeditation beyond a reasonable doubt on the charge of attempted first degree murder.

## D. Intoxication Defense

In addition to contending that the State failed to prove premeditation in either crime, the Defendant asserts that his intoxication negated the premeditation and intent elements in both convictions. He points to the testimonies of Officer Ross and Lieutenant Davidson at trial. Officer Ross testified that, on the day of the shooting, the Defendant's eyes were glassy, and the Defendant had the odor of alcohol on his breath. Lieutenant Davidson testified that the officers chose not to interrogate the Defendant on the day of the shooting because "[the Defendant] was drunk." However, Lieutenant Davidson also indicated that the Defendant appeared coherent, and the decision to wait until the following day to question the Defendant was "out of an abundance of caution."

Although voluntary intoxication is not a complete defense to prosecution for a crime, such evidence is admissible to negate a culpable mental state. See Tenn. Code Ann. § 39-11-503(a) (2006); State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000). The weight to place on such evidence and "the determination of whether the voluntary intoxication negated the culpable mental elements" are issues to be resolved by the jury. Morris, 24 S.W.3d at 796. All evidence regarding the amount of alcohol the Defendant had consumed, the Defendant's appearance and demeanor as observed by the officers, and the officers' decision not to question the Defendant were presented to the jury.

Additionally, the jury received instructions regarding intoxication in compliance with Tennessee Code Annotated section 39-11-503(a) that stated:

> Included in the defendant's plea of not guilty is his plea of intoxication as a defense . . . . Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and, while in that condition, commits an act which would be a crime if [he] were sober, [he] is fully responsible for [his] conduct . . . . Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state . . . . If you find that the defendant was intoxicated to the extent that [he] could not have possessed the required culpable mental state, then [he] cannot be guilty of the offense charged. If you are not satisfied beyond a reasonable doubt that the defendant possessed the culpable mental state then you must find him not guilty.[7]

The jury rejected the Defendant's claim of voluntary intoxication, as was its prerogative. The Defendant is entitled to no relief on this basis. Therefore, we find that

---

[7] See T.P.I.Crim. 40.02 (14th ed. 2010).

there was sufficient evidence to support both the first degree premeditated murder and attempted first degree murder convictions beyond a reasonable doubt.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions for first degree murder and attempted first degree murder.

_____
JEFFREY S. BIVINS, JUDGE